HARDT *v.* LIBERTY HILL CONSOLIDATED MIN. & WATER Co. and others.

*(Circuit Court, D. California.* May 16, 1886.)

1. INJUNCTION—MODIFICATION OF ORDER—SERVICE OF PAPERS.
    The rules and practice of the circuit court of the Ninth circuit, on an order to show cause why an injunction should not be modified, require copies of all the moving papers to be served with the order; and mere supporting affidavits cannot be filed in opposition to the affidavits showing cause, where the latter only controvert the moving affidavits, and do not set up any new affirmative matter constituting a defense.

2. MINES AND MINING CLAIMS—MINING DEBRIS—IMPOUNDING DAMS.
    No dam for impounding mining *debris,* erected in mountain rivers, should be held sufficient to protect riparian and other proprietors below, where the determination of their sufficiency rests upon the opinions of engineers, apparently equally intelligent, and those opinions are at variance; nor upon any evidence not of the most unquestionable and satisfactory character.

3. SAME.
    It is not the province of the court to speculate upon the sufficiency of means adopted by trespassers for the protection of parties trespassed upon, or the sufficiency of such means to resist the action of the forces of nature, where the *data* for a correct determination are uncertain and unreliable, and where an error in judgment is liable to work great injury to the latter.

In Equity.
*A. L. Rhodes* and *A. L. Hart,* for complainant.
*James K. Byrne,* for respondent.

SAWYER, J. This is a suit similar to the somewhat noted *Mining Debris Case,* 9 Sawy. 441, S. C. 18 Fed. Rep. 753, to enjoin defendants from discharging the *debris* resulting from hydraulic mining into Bear river, by means of which it is carried down and deposited

upon the lands of complainant, who is a riparian proprietor in the Sacramento valley, on the river below. A preliminary injunction having been granted, one of the defendants, the Liberty Hill Consolidated Mining and Water Company constructed a dam across the river in the canon below its mines for the purpose of impounding the *debris* resulting from its mining operations, and preventing it from flowing down the river, and injuring complainant. It now moves for a modification of the injunction on that ground, so as to be permitted to proceed with its mining. The defendant moves upon two affidavits of its engineers, describing the dam and its mode of construction, and declaring their opinion that it is wholly sufficient to permanently impound the *debris* and obviate all injury for the future. Complainant, in opposition, presents affidavits of two other engineers, who give their account of the construction and character of the dam, and express a decided opinion that the dam is wholly insufficient to accomplish the intended purpose. The defendant replies by affidavits of seven other parties sustaining the position of defendant, and contradicting complainant's affidavits in some particulars, to which complainant again responds by several counter-affidavits. The second batch of both respondent's and complainant's affidavits is objected to by the opposing party as not being admissible under the rules and practice of the court. The respondent in the case is the moving party, and the rules and practice in this court require that all the papers and affidavits upon which the motion is based shall be served with the notice of motion or order to show cause, and that supporting affidavits will not afterwards be received, unless, in the discretion of the court, the moving party is permitted to reply, where the other party sets up *new affirmative matter constituting a good answer to the application.* In this case the second batch of affidavits filed in response to complainant's affidavits in answer to the order to show cause all related to the character, structure, and sufficiency of the dam for the purpose intended, and cover the same ground precisely as the moving affidavits, only they go more minutely into the particulars of the facts, in response to the more particular statement of facts given in the complainant's affidavits, and state the then present condition of the dam. We do not think the complainant's affidavits, in response to the order to show cause, presented *any new affirmative matter constituting a defense*, within the meaning of the rules and practice of this court, that should entitle the moving party to reply. If the respondent desired to use them, we think these supporting affidavits, so far as they relate to the condition of the dam at the time the order to show cause was obtained, should have been served as a part of the moving papers, so that complainant could have an opportunity to reply specifically to each fact. The affidavits are *ex parte*, no opportunity for cross-examination having been afforded. As they were not served as a part of the moving papers, if they are to be considered at all, or even so far

as they relate to the subsequent condition of the dam, we think the second batch of affidavits in response should also be considered.

The respondent originally rested its application upon the two affidavits of the engineers, which its counsel, doubtless, deemed sufficient, describing the plan and construction of the dam, and giving their opinion of its operation and efficiency, and the complainant in the bill put in two counter-affidavits of other engineers, controverting the positions in some particulars of their opponents. Complainant might well be content to oppose his two witnesses to the two of the moving party upon the points covered by the affidavits, when he would not have done so had they been supported in their position by seven other witnesses. To receive these seven supporting affidavits, and reject those offered by complainant to contradict them and support his own, would be giving respondent an unfair and inequitable advantage. If one set of supporting affidavits is considered, the other must be also, and, as there are some peculiarities in the case, it is perhaps best to consider both. But, under the view we take in this particular case, it is a matter of little consequence, except so far as it is desirable to insist upon correct practice, how we rule on this point, for the result must be the same in either event.

Upon the affidavits of the moving party, both originally and subsequently filed, taken either with all the affidavits of the complainant, or with the affidavits of the two engineers alone, presented by him, we are by no means satisfied that the dam in question—a dam 40 feet high, erected on a bed of *debris* already 60 feet deep, brought down from the mines as the result of previous washing—is sufficient to either permanently, or for any considerable period of time, accomplish the intended purposes, and adequately protect the complainants from the mining *debris* to be discharged into Bear river. In the face of the conflicting views of engineers on the subject, it is impossible to be satisfied of the sufficiency of this dam. The whole matter rests in mere opinion. We have no right to blindly speculate upon matters of such consequence. With our limited facilities, we cannot foresee, with reasonable certainty, what may occur in these mountain rivers, confined in deep canons, which sometimes become irresistible torrents.

Nothing short of the attribute and prescience of omniscience is equal to the task of determining the absolute sufficiency of such a dam, and nothing should be accepted as sufficient, except upon the most indisputable and demonstrative evidence. Where the earth and other material displaced in mining are removed from their bed, and cast into the main rivers in the mountains, they at once become subject to the operation of the tremendous forces of nature, against which the puny efforts of man can interpose but feeble barriers, at best,—can accomplish but little. A small beginning, arising from slight causes, originating in accident or design, or from the active forces of nature, may soon develop into a destructive breach in a dam

like that in question. Malice may instigate the application of dynamite, and the blowing up of the dam, as was claimed by the owners to be the case—although it is not a known fact—with the English dam some three years ago, and is now claimed with respect to the *debris* dam in Humbug canon. The English dam had been constructed with the highest degree of engineering skill, by parties whose *highest interests* required that it should be absolutely sufficient and safe under all contingencies; yet, through accident, malice, the forces of nature, or some other cause unknown, it gave way, and precipitated its destructive flood of water, in 10 hours, upon the plains 85 miles distant below, breaking, in several places, where the water channel was more than a mile wide, levees that had withstood the ordinary floods of the rainy seasons, and doing great damage to the surrounding country. *Debris Case,* 9 Sawy. 484; S. C. 18 Fed. Rep. 766.

The lamentable failure of the state in building *debris* restraining dams under the direction of its own engineers, after an expenditure of half a million of dollars, and the equally unsuccessful efforts of private mining companies shown in the *Debris Case,* 9 Sawy. 480, S. C. 18 Fed. Rep. 763, furnish a warning against relying too confidently upon the skill or opinions of engineers, however eminent. The restraining and impounding dams erected by the state, whose interest it was to make them sufficient, were in the plains, on comparatively low grades. That of the English dam, doubtless, was in a more difficult position, and was a water dam merely. These were on a larger scale, it is true, and, possibly, some of them in more dangerous positions, than the present one; but, if so, it is only a difference in degree. The same principles of physics and dynamics underlie and control and govern them all. It is not for us, with our limited faculties, to estimate and speculate upon possibilities, and measure off and lay down a line indicating just how far trespassers may encroach upon the domain and overpowering forces of nature, within the supposed limits of reasonable possibility or probability, with safety to the rights of the parties below upon whom the trespasses are committed. A court having power to enjoin the nuisance might, with just as much propriety, refuse an injunction against the erection by the owner on his own premises of a magazine for the storage of gunpowder and dynamite, adjoining and next to his neighbor's house, upon the evidence of experts in the matter that the magazine is constructed with the most perfect skill, and that it is and will be guarded by all the means for securing safety known to science. Such a magazine might never explode, yet it is liable to explode at any moment. And the same would be true of one of these restraining *debris* dams, built across one of these main mountain rivers, liable to become roaring torrents. It might not give way for years, yet it is liable to do so at any time during a flood.

If restraining dams must be relied on by the inhabitants of the valleys of California to protect them from destruction from mining

*debris*, it would seem that such dams should be constructed by or under the supervision, and in accordance with the ideas, of the parties in danger and liable to be injured, rather than under the supervision, and according to the views, of those who commit the trespasses and perform the acts which give rise to the danger, and whose interests are not endangered, or in any respect liable to suffer. The party in danger should be the party to determine the measure of his protection,—not the party creating the danger for his own benefit.

It is for the pecuniary interest of hydraulic miners to get out as much of the precious metals as possible, with the least possible expense. The interests of the moving party in this matter are simply to tide over the present, and escape injunctions until its mines can be worked out. What happens afterwards is no concern of his. As human nature is constituted, the action of parties so situated, set in motion by an application of the coercive powers of the law, in the erection, at their own expense, and according to their own ideas, of impounding dams for the sole protection of the rights of those upon whom they commit trespasses, should be scrutinized with jealous care by those who administer the laws, and whose imperative duty it is to see that each man shall so use his own as not to injure his neighbor. It may well be doubted whether any restraining dam, however constructed, across the channels of the main mountain rivers, of a torrential character, should be accepted by the courts as a sufficient protection to the occupants of land in the valleys below liable to be injured. But if any are to be accepted, they should only be those the ample sufficiency of which has been established upon testimony of the most unquestionable and satisfactory character. Nothing should be left to conjecture. This is not a matter of a single dam. A rule must be laid down applicable to the entire gold-bearing region. It will be no use to restrain one mine, if others are allowed to run. Besides, it would be unjust. All doing injury must be stopped or restrained from contributing to further injury, or none.

In discussing this subject in the *Mining Debris Case*, 9 Sawy. 537, S. C. 18 Fed. Rep. 803, we said, respecting the general practicability of building safe impounding dams:

"As is usually the case, the views of different engineers and experts, distinguished in their profession, differ widely upon the point of practicability and safety. The larger number of witnesses called, and much the larger amount of testimony in this case, so far as mere opinion goes, are, doubtless, in favor of the practicability, *if sufficient means are furnished*. But all the practical experiments heretofore made, at great expense, under the supervision of the state, and of competent engineers, have been lamentable failures. The dams constructed were, doubtless, in many particulars defective. But what guaranty has the court, and those whose lives and property are at stake, that any future works of the kind will not also be defective? As at present advised, with some knowledge of the tremendous forces of nature, we cannot undertake to say, upon the mere opinion of experts generally at variance, as in this case, however competent, that the scheme would be practicable and safe. We cannot define in advance w' + works shall be suffi-

cient, and authorize the continuance of the acts complained of upon the performance of any prescribed conditions.    In view of past experience here and elsewhere, with the damming up of waters, and of the wide difference of opinion of competent engineers on the subject, it is clear that *we should not be justified in an attempt to prescribe in advance any kind of a dam under which a large community shall be compelled to live, in dread of a perpetual, seriously alarming, and ever present, menace.*"

My associate added:

"Besides, it is a very serious question in my mind whether any person or community can or ought to be required to submit to the continuous peril of living under or below such a dam as this must necessarily be, if it is made high enough to impound the coarse material; and this, merely for the convenience of another person or persons in the pursuit of his or their private business. It may be likened, at least, to living in the direct pathway of an impending avalanche." Id. 551.

The more we reflect upon this point the more confident we are in the soundness of the views there expressed.    We cannot know whether the dam in question will be sufficient for the purposes indicated, or whether it will be kept in repair, and continue to be adequate; and we have no right to speculate upon what may happen at the expense of or peril to the safety of complainant, and numerous others occupying similar situations.    We might as well undertake to prescribe in advance the kind of dam that would be deemed and held sufficient and satisfactory, as to determine now whether this dam will now be, and hereafter continue to be, adequate to the purposes intended.    We cannot undertake to do either.    We cannot undertake to set bounds to the operations of the forces of nature, where the rights of others are liable to be thereby seriously injured should these bounds be erroneously fixed.

Although we do not claim to be experts in these matters, yet, with some knowledge of physics, and the laws which govern the forces of nature, and with no inconsiderable observations of the results of their operation, we cannot say, even upon the very intelligent affidavits of the moving party's witnesses, without considering the complainant's affidavits at all, that we are satisfied that the dam in question is or will be sufficient for the purposes intended, or at all adequate to protect the complainant, and others similarly situated, from further injury.    And this want of satisfaction is largely increased by the opposing opinions and statements of the engineers whose affidavits, apparently equally intelligent and reliable, were taken and presented on behalf of the complainant.    We are fully satisfied that the motion to modify the injunction should be denied, and that the order suspending its operation should be vacated.

Both witnesses and counsel state that they have constructed this dam upon the suggestion of the court upon the subject, apparently intimating that, having done so, the court is committed to their view as to their rights.    If this is the supposition, it is not perceived how any such idea could have been derived from anything said in

the *Debris* or any other case. Indeed, all that was said in the discussion of the questions in that case, as will be seen from the extracts given, leads in a contrary direction. The case was a new one, involving vast interests. The manifest hardship of stopping hydraulic mining, upon mining investments was painfully evident to the court; and being extremely anxious not to interfere with those interests any further than was absolutely necessary to protect the rights of others wrongfully injured by these operations, and wishing to be in a position to relieve the mining interests from any unnecessary hardship, should any change of conditions or other contingency arise by which it could properly be obviated, it was in conclusion observed:

"As it is possible that some mode may be devised in the future for obviating the injuries, either one of those suggested, or some other successfully carried out, so as to be both safe and effective, a clause will be inserted in the decree giving leave on any future occasion, when some such plan may have been successfully executed, to apply to the court for a modification or suspension of the injunction."

The clause suggested, whether wisely or not we do not yet know, was accordingly inserted in the decree. But it in no degree indicated what would be deemed "safe and effective" to protect the interests of the parties in such sense as to justify a modification of the decree; and there was, certainly, no indication as to what means would be "safe and effective" as to the mine then in question, and much less at the point where the dam now under consideration is located.

Let the motion be denied, and the order temporarily suspending the operation of the injunction against the Liberty Hill Consolidated Mining & Water Company be vacated, and the injunction reinstated.